UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 23-MJ-000034 |
| | ) | |
| KENDRID HAMLIN, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## MOTION AND MEMORANDUM IN SUPPORT OF PRETRIAL RELEASE TO RESIDENTIAL INPATIENT TREATMENT

Mr. Kendrid Hamlin, through counsel, respectfully requests that this Court release him to residential inpatient treatment on GPS monitoring, pursuant to the Bail Reform Act, 18 U.S.C. § 3142 and *United States v. Salerno*, 481 U.S. 739 (1987). The government seeks preventative detention under 18 U.S.C. 3142 (f)(2)(A).  Section 3142(b) states that the Court "shall order the pretrial release of [Mr. Hamlin] on personal recognizance . . . unless" there are absolutely no conditions of release that would ensure Mr. Hamlin's appearance at court.  The government's concerns that there is a "serious risk" that the defendant will flee prosecution are entirely addressed by the defense's proposed release plan, which includes the inpatient treatment that is objectively necessary and location monitoring.  It is the government's burden to show by a preponderance of the evidence that Mr. Hamlin is a serious risk of flight and requires detention pretrial, regardless of whatever conditions are available to the Court. The government cannot meet that burden here. Despite his history, it is Counsel's understanding that Mr. Hamlin has never had the combination of location monitoring and a stable residence where he would receive mental health services and addiction treatment. And while Mr. Hamlin has clear socioeconomic deficiencies, his guideline range in this case will likely return him to the community in the not-too-distant future.  Because there are a combination of conditions that will reasonably ensure his

1

appearance and ensure the safety of the community. Mr. Hamlin should be released on GPS to residential inpatient treatment with mental health treatment, as detailed below.

I.      **Background**

Mr. Hamlin is charged by Complaint with Assault on a Member of Congress in violation of Title 18 U.S.C. § 351(e). It is the Government's position that the statute does not require that the accused be aware that the complainant is in fact a member of Congress. This is notable because the lack of that knowledge substantially diminishes the applicable Guideline range. The Government does not allege, nor does the complainant believe, that the conduct in question here was targeted.

The Government alleges that on February 9, 2023 at approximately 7 am, Mr. Hamlin was inside the lobby of an apartment building located in the 300 block of H St. NE, Washington, DC. The Government further alleges that the complainant went to the lobby for coffee and entered the elevator. She was followed into the elevator by a man who police later identified to be Mr. Hamlin. The complainant alleges that once inside the elevator, he asked to use her bathroom. She refused and the man began acting erratically, doing pushups on the floor and standing in front of the elevator buttons. She said that she became afraid for her safety and attempted to push the elevator buttons. This led to a physical altercation in which she threw her hot coffee on the man, left the elevator and called the police.  The complainant alleges that she was hit in the face and grabbed around the collarbone during the struggle, ultimately causing a small bruise on her chin and a small abrasion on her upper lip.

At approximately 4:50 pm later that day, officers stopped to question Mr. Hamlin, who was sitting on the sidewalk near the intersection of D St. and 2nd St. NW. Officers compared his appearance to a still photograph from the lobby of the apartment building and, determining that he resembled the suspect, placed him under arrest. Believing that Mr. Hamlin was experiencing

psychiatric symptoms, officers transported him to the emergency room at Washington Hospital Center. While at the hospital chained to a gurney, and despite compliance with instructions, Mr. Hamlin was forcibly injected with both Versed, a sedative, and Droperidol, an antipsychotic.

Mr. Hamlin was initially presented in DC Superior Court on February 10, 2023, where he appeared nearly catatonic, unable to stand on his own, and minimally responsive. He then appeared before this Court on February 13, 2023. Mr. Hamlin consented to detention at that time and has remained detained at the DC jail since that time.

## II.    Legal Standard

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(b) and (c)(1)(B).  The Supreme Court has explained:  "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *Salerno*, 481 U.S. at 755; *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose.").  "Nothing in this section shall be construed as modifying or limiting the presumption of innocence."  18 U.S.C. § 3142(j).  As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.).  "It is only a 'limited group of offenders' who should be [detained] pending trial."  *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. N. 98-225 at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3189).  Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant."  *Motamedi*, 767 F.2d at 1405. The potential penalties for this offense

3

also favor release.  *See United States v. Vazquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019)

(finding factor in favor of release because exposure to a sentence to 12-months is a "relatively

low penalty").

It is the government's burden to demonstrate either by a preponderance of the evidence

that the defendant is more likely than not to flee, or by clear and convincing evidence that

preventative detention is necessary to ensure the safety of the community.  *See United States v.*

*Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) (Breyer, J.).  The four factors a court must consider to

determine whether an individual is a flight risk are (1) "the nature and circumstances of the

offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and

characteristics of the person," including "the person's character, physical and mental condition,

family ties, employment, financial resources, length of residence in the community, community

ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record

concerning appearance at court proceedings"; and (4) "the nature and seriousness of the danger

to any person or the community that would be posed by the person's release." 18 U.S.C. §

3142(g). A determination that an individual is a flight risk must be supported by a preponderance

of the evidence.'" *United States v. Vortis*, 785 F.2d 327, 328–29 (D.C. Cir. 1986) (per curiam).

### III.    The Government Has Not Met Its Burden to Demonstrate that Mr. Hamlin is a "Serious Risk of Flight."

First, it is important to note that preventative detention is not available to the court under

the dangerousness finding, but only as a serious risk of flight. The plain language of the statute

only permits detention at the Initial Appearance when the defendant poses a "*serious* risk" of

flight, § 3142(f)(2)(A) (emphasis added). Ordinary "risk of flight" is not a factor in § 3142(f).

There is some risk of flight in every criminal case; "serious risk" of flight means something

more. According to a basic canon of statutory interpretation, the term "*serious* risk" means that

the risk must be more significant or extreme than an ordinary risk. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (noting interpretation of statute should be reluctant to treat statutory terms as surplusage).

The BRA's legislative history makes clear that detention based on serious risk of flight is only appropriate under "extreme and unusual circumstances.[1] For example, the case relied on in the legislative history as extreme and unusual enough to justify detention on the grounds of serious risk of flight involved a defendant who was a fugitive and serial impersonator who had failed to appear in the past, and had recently transferred over a million dollars to Bermuda. *See Abrahams*, 575 F.2d at 4. The government must demonstrate that the risk of flight in a particular case rises to the level of extreme or unusual, and Counsel believes no such showing has been made here.

In addition, a defendant should not be detained as a "serious risk" of flight when the risk of non-appearance can be mitigated by conditions of release. The only defendants who qualify for detention under § 3142(f)(2) are those who are "[t]rue flight risks"—defendants the government can prove are likely to willfully flee the jurisdiction with the intention of thwarting the judicial process.[2] As stated below, the Government has not met its burden of proving that the risk of non-appearance in this case cannot be mitigated by certain stringent conditions of release.

## IV.   In This Case, the Government Has Not Met Its Burden of Proving That Mr. Hamlin Poses a "*Serious*" Risk Of Flight Under § 3142(f)(2)(A).

---

[2] *See, e.g.,* Lauryn Gouldyn, *Defining Flight Risk*, 85 U. Chi. L. Rev. 677, 724 (2017). This rule is sound policy, as the risk of a defendant becoming either a "local absconder" (who intentionally fails to appear but remains in the jurisdiction), or a "low-cost non-appearance" (who unintentionally fails to appear), can be addressed by imposing conditions of release like electronic monitoring, GPS monitoring, and support from pretrial services. *See* Gouldyn, 85 U. Chi. L. Rev. at 724.

Mr. Hamlin should be released on conditions because there is not a "serious risk that the [defendant] will flee" the jurisdiction under § 3142(f)(2)(A). Mr. Hamlin has lived in the DC area for his entire life. His mother, father, siblings, and many other members of his extended family also reside in the DMV area. While indeed Mr. Hamlin appears to have missed court dates in the past, it is also clear that Mr. Hamlin has been experiencing both homelessness as well as mental health concerns which undoubtedly influenced his non-appearance. The proposed release plan would mitigate any concerns regarding flight risk. The release plan cited below would require release on GPS and the equivalent of home confinement in a residential inpatient drug treatment program, where Mr. Hamlin would be supported by caseworkers and mental health professionals while attending intensive inpatient treatment.[3] Furthermore, the § 3142(g) factors in this case mitigate in favor of release, as detailed below.

A.    *The Nature and Circumstances of the Offense*

To begin, the offense for which Mr. Hamlin was charged is not detention eligible, reflecting Congress' determination that such offenses should normally result in pretrial release. The complainant herself noted erratic behavior and limited injuries. The government agrees that the complainant was not targeted because she was a Congresswoman and that her occupation was unknown during the incident.

And while Mr. Hamlin's arrest became confrontational, this was in no way the fault of Mr. Hamlin.  Many hours later, when officers encountered Mr. Hamlin, he was seated peaceably on the ground outside. As officers began to speak with him, Mr. Hamlin identified himself and was compliant, remaining seated peacefully for several minutes while officers compared still

---

[3] For more information about the intensive inpatient treatment program, see https://www.samaritaninns.org/program/atp/. Information about the Men's Transitional Treatment Program, which includes 6 months of ongoing treatment and supportive housing is available here: https://www.samaritaninns.org/program/transition/.

photos from the lobby of the apartment building where the incident occurred to Mr. Hamlin. Once officers decided to arrest him, an officer asked him to stand so he could conduct a patdown, disingenuously telling Mr. Hamlin that they just needed to do so in order to take him to his mother's house and get him help. However, once Mr. Hamlin stood and turned around, complying with the officer's request, numerous officers surrounded him and forcibly placed him in handcuffs, contrary to their promises. It was in this context that officers allege that Mr. Hamlin reacted against the officers. There are no allegations that Mr. Hamlin was carrying, brandished or used a weapon of any kind or that he otherwise threatened the complainant. Rather, it appears clear that this offense arose out of Mr. Hamlin's homelessness and untreated mental illness.

B.      *The Weight of the Evidence*

The weight of the evidence is the least important factor for the Court to consider but there is nothing about the evidence that lends support to the assertion that Mr. Hamlin is a serious risk of flight.  According to the statement of facts, Mr. Hamlin did not brandish or use a weapon or specifically target the complainant. Mr. Hamlin was unhoused and seeking shelter and a restroom when he encountered the complainant. Mr. Hamlin also did not initiate physical contact – a physical altercation occurred as she attempted to push past Mr. Hamlin in an effort to exit the elevator. There is no video surveillance from inside the elevator.

C.      *The History and Characteristics of Mr. Hamlin*

Mr. Hamlin's history and characteristics demonstrate that there are conditions of release that can reasonably assure his appearance and protect the community. Mr. Hamlin has lived in D.C. area for his entire life and has significant ties to the community. His mother, father, siblings, and numerous other relatives all reside in the DMV area. Since his initial appearance, counsel has had the opportunity to speak with a number of individuals who know Mr. Hamlin

7

well, including his mother, father and prior counsel. By all accounts, Mr. Hamlin has indeed experienced mental illness and homelessness, as well as struggled with substance abuse as a means of self-medicating his mental health symptoms for many years. However, individuals close to him indicate that he is a goodhearted person who merely needs targeted assistance in ensuring he has access to basic necessities, such as housing, food, and psychiatric support and services. While Mr. Hamlin indeed has many prior bench warrants, records indicate that Mr. Hamlin has suffered from mental illness and homelessness for many years, which undoubtedly influenced his non-appearance in Court.  Moreover, those bench warrants reflect the petty nature of the vast majority of his prior convictions and the instability in his life.  With residential drug treatment and mental health services in addition to location monitoring, Mr. Hamlin will be able to comply with his conditions and will appear for court. He is a man suffering from mental illness and homelessness who needs treatment, not incarceration.

> D.   *The Nature and Seriousness of the Danger to Any Person or the Community Posed by Mr. Hamlin's Release*

The dangerousness analysis "does not turn on any generalized, backward-looking assessment" of the offender or the crime.  *Munchel*, 991 F.3d at 1286 (Katsas, J., concurring). "Instead, it turns on a specific, forward looking assessment of whether" the individual "currently pose[s] an unmitigable threat to public safety."  *Id*.  The government has not and cannot provide specific evidence to support a finding that Mr. Hamlin poses an unmitigable threat to public safety.  He is charged with an offense that does not permit preventative detention and the proposed conditions address any hypothetical concerns.

**V.   Detaining Mr. Hamlin as a Serious Risk of Flight Is Not Only Legally Unsupported, But Is Also Harmful and Unnecessary.**

> A.   *Detention can have disastrous consequences on an individual's life, and particularly on an individual like Mr. Hamlin suffering from mental illness.*

Congress was correct to cabin pretrial detention to "extreme and unusual circumstances," because even very short periods of detention have been shown to seriously harm defendants. In addition to the trauma and danger inherent in a jail stay,[4] jails' physical and mental health screenings and treatment offerings are often woefully inadequate.[5] Such harms are exacerbated for individuals like Mr. Hamlin who suffer from mental illness. *See* Exhibit A, Articles documenting harms for mentally ill individuals in prison.

Research shows that incarceration is far more dangerous and harmful to individuals suffering from documented and persistent mental illness like Mr. Hamlin.[6] As summarized by Mental Health America, "[o]ver the past 50 years [America has] gone from institutionalizing people with mental illnesses, often in subhuman conditions, [in state mental health hospitals] to incarcerating them at unprecedented and appalling rates—putting recovery out of reach for millions of Americans."[7] In Mr. Hamlin's case, he is in need of intensive psychiatric support and substance abuse treatment, which is simply unavailable at the D.C. Jail. Because Mr. Hamlin has never received proper mental health care at the D.C. Jail, he has often ended up in solitary

---

[4] See Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09*, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK; Margaret Noonan, et al., *Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables*, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

[5] *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Justice Statistics 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman, et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 Journal of Substance Abuse Treatment 239, 247–49 (2007), archived at https://perma.cc/G55Z-4KQH.

[6] See Quant, Karen, "Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health," Prison Policy Institute, May 13, 2021 (available at https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/).

[7] See Position Statement: Mental Health Treatment in Correctional Facilities, Mental Health America (available at https://www.mhanational.org/issues/position-statement-56-mental-health-treatment-correctional-facilities).

confinement or suicide watch while detained there – a dangerous trend that is disturbingly common for mentally ill individuals in prison. Indeed, to this day, the Jail has been replacing his medication with others for which he has not been prescribed.  Continuing to detain Mr. Hamlin in this case could seriously jeopardize his physical and mental wellbeing, and will do nothing to put him on the path to true rehabilitation and stability. As the complainant herself stated in one of her news interviews, he "hasn't received the help he needs to even have a chance at rehabilitation." Given his history, for Mr. Hamlin, his detention is punitive.

     B.    *Many Conditions of Release Have Been Proven to Effectively Manage Ordinary Risk of Flight or Nonappearance.*

Any concerns the Court may have about local nonappearance can be allayed by imposing any number of conditions of release that have been shown empirically to reduce the risk of local nonappearance. For example, a study conducted in New York state courts found that text message reminders were able to reduce failures to appear by up to 26%, translating to 3,700 fewer arrest warrants per year.[8] Holistic pre-trial services focused on providing social services and *support* to clients also reduce the risk of non-appearance across all risk levels in state systems.[9] Beyond the traditional role of Pretrial Services, this could include providing funding for transportation to court and assisting clients in finding stable housing, employment or education.[10] Moreover, scholars and courts agree that electronic monitoring is especially effective at reducing risk of flight.[11]

---

[8] *See* Brice Cooke et al, *Text Message Reminders Decreased Failure to Appear in Court in New York City*, Abdul Latif Poverty Action Lab (2017), archived at https://perma.cc/JCW7-JVZW.

[9] *See generally* Christopher Lowenkamp and Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes*, John and Laura Arnold Foundation, Special Report (2013), archived at https://perma.cc/R3F3-KZ76.

[10] *See generally* John Clark, *The Role of Traditional Pretrial Diversion in the Age of Specialty Treatment Courts: Expanding the Range of Problem-Solving Options at the Pretrial Stage*, Pretrial Justice Institute (2007), archived at https://perma.cc/5C8C-7HJK.

[11] *See, e.g.*, Samuel R. Wiseman, *Pretrial Detention and the Right to the Monitored*, 123 Yale L.

VI.   **Statistics Showing that It Is Extremely Rare for Defendants on Bond to Flee or Recidivate Demonstrate that Mr. Hamlin Does Not Pose A Serious Risk of Flight or Danger to the Community.**

In this case, this Court should be guided by Administrative Office of the Courts statistics showing that nearly everyone released pending trial appears in court and does not reoffend. In fact, in 2019, 99% of released federal defendants nationwide appeared for court as required and 98% did not commit new crimes on bond.[12] Significantly, this near-perfect compliance rate is equally evident in federal districts with very high release rates and those with very low release rates.[13]  Even in districts that release two-thirds of all federal defendants on bond, fewer than 1% fail to appear in court and just over 2% are rearrested while released.[14]  The below chart reflects this data:

---

J. 1344, 1347–48 (2014) ("Increasingly sophisticated remote monitoring devices have the potential to sharply reduce the need for flight-based pretrial detention . . . . [T]he question of finding other ways of ensuring a non-dangerous defendant's presence at trial is one not of ability, but of will. . . ."); *id.* at 1368– 74 (citing studies in both European and American contexts to demonstrate that electronic monitoring is at least as effective as secured bonds at deterring flight, and that it comes at far reduced cost to both the defendant and the government); *United States v. O'Brien*, 895 F.2d 810, 814–16 (1st Cir 1990) (describing reduction in flight rate from monitoring program and concluding that "evidence concerning the effectiveness of the bracelet alone [] arguably rebuts the presumption of flight").

[12] Ex. 1, AO Table H-15 (Dec. 31, 2019), *available at* Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

[13] The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019.  *See* Ex. 2, AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42.  The failure-to-appear and rearrest rates for these districts were calculated using Exhibit 1, AO Table H-15.  The districts with the lowest release rates in 2019 were, from lowest to highest, S.D. California, W.D. Arkansas, E.D. Tennessee, S.D. Texas, E.D. Missouri, N.D. Indiana, E.D. Oklahoma, W.D. Texas, W.D. North Carolina, C.D. Illinois; the districts with the highest release rates are, from lowest to highest, E.D. Michigan, E.D. Arkansas, D. New Jersey, E.D. New York, D. Maine, D. Connecticut, W.D. New York, W.D. Washington, D. Guam, D. Northern Mariana Islands.  *See* Ex. 2.

[14] *See* Exs. 1 and 2.





Despite the statistically low risk of recidivism that defendants like Mr. Hamlin pose, the government recommends detention in 71% of cases.[15]  Mr. Hamlin should be released to treatment because the government has not presented evidence that shows that he would be among the approximately 2% of defendants who commit another crime while on pretrial release.

## VII.   Mr. Hamlin Should Be Released Because There Are Conditions That Will Reasonably Assure Appearance and Safety.

Mr. Hamlin should be released because there are conditions that will reasonably assure the safety of the community and Mr. Hamlin's appearance in court. A defendant cannot be detained "unless a finding is made that no release conditions 'will reasonably assure . . . the safety of the community'" and the defendant's appearance in court.  *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (quoting 18 U.S.C. § 3142(e)).  Here, the government has not carried its high burden and Mr. Hamlin should not be detained.

The following conditions of release under § 3142(c)(1)(B), and any other conditions the

---

[15] *See* Ex. 3, AO Table H-3 (September 30, 2021), *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_h3_0930.2021.pdf.

Court deems necessary, will reasonably assure Mr. Hamlin's appearance in court and the safety

of the community, as well as provide a pathway to long-term stability, housing, and wraparound

mental health and supportive services for Mr. Hamlin:[16]

- Placement at Samaritan Inns Inpatient Treatment Program with Transitional Housing Program to follow;

- GPS monitoring with Home Incarceration while in treatment;

- Immediate connection to a DC Office of Behavioral Health Core Service Agency for possible ACT Team Services and ongoing psychiatric care while in inpatient treatment, as well as assistance in applying for economic supports such as SSDI;

- Referral to the Department of Disability Services for one on one aide services and future supportive housing;

- Reporting on a "regular basis" to Pretrial Services Agency or some other agency, *id*. § 3142(c)(1)(B)(vi);

- Refrain from "any use of a narcotic drug or other controlled substance . . . without a prescription," *id*. § 3142(c)(1)(B)(ix).

## VIII.   Conclusion

For the foregoing reasons, Mr. Hamlin respectfully requests that this Court release him to

inpatient treatment as noted above with conditions.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Kathryn D'Adamo Guevara
Eugene Ohm
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[16] Counsel may supplement this motion with additional information prior to the next hearing.